SIERRA CLUB and Environmental Technology Council, Inc., Petitioners,

v.

ENVIRONMENTAL PROTECTION AGENCY, Respondent.

American Chemistry Council, et al., Intervenors

No. 01–1057.

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 11, 2002.

Decided June 18, 2002.

David R. Case argued the cause and filed the briefs for petitioners.

G. Scott Williams, Attorney, U.S. Department of Justice, argued the cause for respondent. With him on the brief were John C. Cruden, Deputy Assistant Attorney General, and Alan Carpien, Attorney, U.S. Environmental Protection Agency.

David F. Zoll, Leslie A. Hulse, G. William Frick, Ralph J. Colleli, Douglas H. Green and Steven J. Groseclose were on the brief for intervenors.

Before: GINSBURG, Chief Judge, RANDOLPH and TATEL, Circuit Judges.

Opinion for the Court filed by Chief Judge GINSBURG.

GINSBURG, Chief Judge:

The Environmental Protection Agency promulgated a rule to establish the conditions under which it would consider certain wastewater treatment sludges "hazardous" within the meaning of the Resource Conservation and Recovery Act, 42 U.S.C. § 6901 *et seq. See* Hazardous Waste Mgmt. Sys., 65 Fed. Reg. 67068 (Nov. 8, 2000) (Chlorinated Aliphatics Rule). The Sierra Club and the Environmental Technology Council challenge the rule as unreasonable and as inconsistent with the plain meaning of the RCRA. Because neither of the petitioners has standing to seek review, we dismiss their petition.

## I. Background

The RCRA establishes a comprehensive regulatory framework for the handling and disposal of "solid waste," including "any garbage, refuse, [or] sludge from a waste treatment plant." 42 U.S.C. § 6903(27). The Act further defines as "hazardous waste" the subset of solid waste that (for specified reasons) may

(A) cause, or significantly contribute to an increase in mortality or an increase in serious irreversible, or incapacitating reversible, illness; or

(B) pose a substantial present or potential hazard to human health or the environment when improperly treated, stored, transported, or disposed of, or otherwise managed.

*Id.* § 6903(5). Subtitle C of the RCRA, 42 U.S.C. §§ 6921–34, establishes "a stringent 'cradle-to-grave' regulatory structure overseeing the safe treatment, storage and disposal of hazardous waste." *Military Toxics Project v. EPA,* 146 F.3d 948, 950

(D.C.Cir.1998). Solid waste that is not deemed hazardous is "regulated much more loosely" under subtitle D of the Act, 42 U.S.C. §§ 6941–49. *City of Chicago v. EDF*, 511 U.S. 328, 331, 114 S.Ct. 1588, 1590, 128 L.Ed.2d 302 (1994).

Under the Agency's established criteria "for identifying the characteristics of hazardous waste," 42 U.S.C. § 6921(a), a waste is "listed" as hazardous if it: (1) "exhibits any of the characteristics of hazardous waste"; (2) "has been found to be fatal to humans [or, if data for humans are not available, then to rats] in low doses"; or (3) contains a substance the Congress has designated a "toxic constituent" capable of causing harm when improperly managed or stored. 40 C.F.R. §§ 261.11(a)(1–3). The last criterion entails a risk assessment in order to determine whether the constituent is in fact "capable of posing a substantial present or potential hazard to human health or the environment." *Id.* § 261.11(a)(3).

In 1984 the Congress directed the EPA to determine whether the byproducts of chlorinated aliphatics should be listed as hazardous pursuant to the Agency's criteria. *See* 42 U.S.C. § 6921(e)(2). The EPA found that the production of certain chlorinated aliphatics, including ethylene dichloride and vinyl chloride monomer (EDC/VCM), generates a wastewater treatment sludge containing two "toxic constituents," arsenic and dioxin, in amounts that could endanger the public health if managed or disposed of improperly. *See* Chlorinated Aliphatics Rule, 65 Fed. Reg. at 67072/1, 67089. The Agency concluded that although the sludge "posed a substantial hazard to human health and the environment when managed in a land treatment unit, [it] did not pose this hazard when managed in a landfill." *Id.* at 67097/1.

Having determined that EDC/VCM sludge threatens human health and the environment under certain conditions, the EPA "conditionally listed" the sludge as a hazardous waste. *See id.* at 67088/3. More specifically, the Agency determined that the wastewater sludges generated during the production of EDC/VCM are hazardous, and therefore must be handled in accordance with subtitle C of the RCRA, unless:

(i) they are disposed of in a subtitle C or non-hazardous landfill licensed or permitted by the state or federal government;

(ii) they are not otherwise placed on the land prior to final disposal; and

(iii) the generator maintains documentation demonstrating that the waste was either disposed of in an onsite landfill or consigned to a transporter or disposal facility that provided a written commitment to dispose of the waste in an off-site landfill.

*Id.* at 67088–89.

There are fourteen facilities, all located in Louisiana and Texas, that generate EDC/VCM sludge. Ten of the facilities send their sludge to landfills for disposal; two treat the sludge on site — that is, they attempt to detoxify it and recycle its components — and two dispose of it as required by subtitle C. The rule under review, therefore, requires only the two facilities that presently treat their sludge to change their method of storing and disposing of the substance, either by placing it in a landfill or by complying with the stringent directives of subtitle C.

The Sierra Club and the Environmental Technology Council — formerly known as the Hazardous Waste Treatment Council — petitioned for review of the Rule. The American Chemistry Council, the American Petroleum Institute, the Utility Solid Waste Activities Group, the Edison Electric Institute, the American Public Power Association, the National Rural

Electric Cooperative Association, and the American Gas Association have intervened to defend the Rule.

## II. Standing

The Sierra Club and the ETC argue that the conditional listing of EDC/VCM sludge cannot be squared with the land disposal restrictions in the Act; the Chlorinated Aliphatics Rule is based upon an untenable interpretation of the RCRA; and the Rule is arbitrary and capricious in substance. The EPA and the intervenors respond first by arguing that the court does not have jurisdiction over the petition because the Sierra Club and the ETC respectively lack constitutional and prudential standing. We consider the standing issues, mindful of our independent obligation to be sure of our jurisdiction. *See High Plains Wireless, L.P. v. FCC,* 276 F.3d 599, 607 (D.C.Cir.2002).

### A. The Sierra Club

■ Under Article III of the Constitution of the United States, an association, such as the Sierra Club, has standing to sue on behalf of its members only if (1) at least one of its members would have standing to sue in his own right, (2) the interests the association seeks to protect are germane to its purpose, and (3) neither the claim asserted nor the relief requested requires that an individual member of the association participate in the lawsuit. *See Hunt v. Washington State Apple Advertising Comm'n,* 432 U.S. 333, 342–43, 97 S.Ct. 2434, 2440–41, 53 L.Ed.2d 383 (1977). The EPA and the intervenors do not argue, nor do we have any reason to believe, that the Sierra Club fails to satisfy the latter two requirements.

■ The issue before the court, then, is whether at least one member of the Sierra Club has standing under Article III. The "irreducible constitutional minimum of standing contains three elements": (1) in-

jury-in-fact, (2) causation, and (3) redressability. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992). For the first element, the Sierra Club must show "that EPA's alleged failings have caused a traceable 'concrete and particularized' harm to their members that is 'actual or imminent.'" *American Petroleum Inst. v. EPA,* 216 F.3d 50, 63 (D.C.Cir.2000) (quoting *Louisiana Envtl. Action Network v. EPA,* 172 F.3d 65, 71 (D.C.Cir.1999) (*LEAN*)) The organization need not prove the merits of its case — "*i.e.,* that localized harm has in fact resulted from a federal rulemaking" — in order to establish its standing, but it "must demonstrate that there is a 'substantial probability' that local conditions will be adversely affected" and thereby injure a member of the organization. *Id.* (quoting *LEAN,* 172 F.3d at 68).

■ In reply to the suggestion in the EPA's brief that it does not have standing, the Sierra Club duly avers that some of its members "live, work, and recreate in communities adversely affected by the chemical plants that produce, store, and transport the EDC/VCM sludge, as well as [by] the on-site and off-site landfills used for sludge disposal," and it claims that "there is a substantial probability that improper management and disposal of EDC/VCM sludge will cause harm" to its members in the vicinity of those facilities and landfills. Bare allegations are insufficient, however, to establish a petitioner's standing to seek judicial review of administrative action.

As the Supreme Court explained in *Defenders of Wildlife,* the burden of production a plaintiff must bear in order to show it has standing to invoke the jurisdiction of the district court varies with the procedural context of the case. At the pleading stage, "general factual allegations of injury resulting from the defendant's conduct may suffice," and the court "presum[es]

that general allegations embrace the specific facts that are necessary to support the claim." *Defenders of Wildlife*, 504 U.S. at 561, 112 S.Ct. at 2137. On a motion for summary judgment, however, "the plaintiff can no longer rest on such 'mere allegations,' but must 'set forth' by affidavit or other evidence 'specific facts,' ... which for purposes of the summary judgment motion will be taken to be true." *Id.* (quoting FED.R.CIV.P. 56(e)). Although the Supreme Court did not address directly the burden of production to be borne by a petitioner, such as the Sierra Club in this case, seeking review of administrative action in the court of appeals, the implication of its teachings is clear.

In such cases, the agency that issued the order under review ordinarily will have compiled an evidentiary record, and the petitioner ordinarily will have participated in the proceedings before the agency. "An administrative agency ... is not subject to Article III of the Constitution of the United States," however, *Pfizer, Inc. v. Shalala*, 182 F.3d 975, 980 (D.C.Cir.1999), so the petitioner would have had no need to establish its standing to participate in the proceedings before the agency. When the petitioner later seeks judicial review, the constitutional requirement that it have standing kicks in, and that requirement is the same, of course, as it would be if such review were conducted in the first instance by the district court. *Compare U.S. Airwaves, Inc. v. FCC*, 232 F.3d 227, 231–32 (D.C.Cir.2000) (applying elements of standing as set out in *Defenders of Wildlife*), *with, e.g., Giles v. Ashcroft*, 193 F.Supp.2d 258, 263 (D.D.C.2002) (same). In either forum, therefore, the petitioner must substantiate its standing "with the manner and degree of evidence required at the successive stages of the litigation." *Defenders of Wildlife*, 504 U.S. at 561, 112 S.Ct. at 2136.

In contrast to the plaintiff in a case that has not yet progressed beyond the pleading stage in the district court — at which stage the court " 'presum[es] that general allegations embrace those specific facts that are necessary to support the claim,' " *id.* (quoting *Lujan v. National Wildlife Fed.*, 497 U.S. 871, 889, 110 S.Ct. 3177, 3189, 111 L.Ed.2d 695 (1990)) — a petitioner seeking review in the court of appeals does not ask the court merely to assess the sufficiency of its legal theory. Rather, like a plaintiff moving the district court for summary judgment, the petitioner is asking the court of appeals for a final judgment on the merits, based upon the application of its legal theory to facts established by evidence in the record. Consistent with *Defenders of Wildlife*, therefore, the petitioner must either identify in that record evidence sufficient to support its standing to seek review or, if there is none because standing was not an issue before the agency, submit additional evidence to the court of appeals. *See Amfac Resorts, L.L.C. v. DOI*, 282 F.3d 818, 830 (D.C.Cir.2002) ("[The petitioners] are not confined to the administrative record. ...Beyond the pleading stage, they must support their claim of injury with evidence").

The petitioner's burden of production in the court of appeals is accordingly the same as that of a plaintiff moving for summary judgment in the district court: it must support each element of its claim to standing "by affidavit or other evidence." *Defenders of Wildlife*, 504 U.S. at 561, 112 S.Ct. at 2137. Its burden of proof is to show a "substantial probability" that it has been injured, that the defendant caused its injury, and that the court could redress that injury. *American Petroleum*, 216 F.3d at 63.

In many if not most cases the petitioner's standing to seek review of administra-

tive action is self-evident; no evidence outside the administrative record is necessary for the court to be sure of it. In particular, if the complainant is "an object of the action (or forgone action) at issue" — as is the case usually in review of a rulemaking and nearly always in review of an adjudication — there should be "little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it." *Defenders of Wildlife*, 504 U.S. at 561–62, 112 S.Ct. at 2137. When the petitioner's standing is not self-evident, however, the petitioner must supplement the record to the extent necessary to explain and substantiate its entitlement to judicial review.

■ The Sierra Club protests in vain that it bears not this burden, observing first that "no Federal rule of appellate procedure, or of this circuit ... requires parties to demonstrate standing through affidavits," and second that the court has "long accepted parties' allegations of standing made by counsel in briefs." The first observation is correct but unavailing in the face of the Supreme Court's teaching that the burden of production for standing is correlative to the burden of production for the substantive elements of the litigant's case at the successive stages of litigation. The second observation, though supported by citations to two of our cases, still is of no help to the petitioner. The court was not impelled in those cases to call upon the petitioners to produce such evidence because the petitioners' standing was clear, *see Horsehead Resource Dev. Co. v. Browner,* 16 F.3d 1246, 1259 (D.C.Cir.1994) ("environmental organizations [whose members live in affected areas] clearly do have standing"); *accord Sierra Club v. EPA,* 129 F.3d 137, 139 (D.C.Cir.1997); those precedents do not relieve the Sierra Club of its duty to answer the call in this case. The Sierra Club well knows as much: after the EPA questioned the Sierra Club's standing in its responsive brief, the Club in its reply brief, citing another pair of this court's decisions, sought specifically "an opportunity to submit post-argument affidavits further demonstrating [its] standing," which request the court granted.

■ Absent good cause shown, however, a litigant should not expect the court to follow that procedure again; experience teaches that full development of the arguments for and against standing requires the same tried and true adversarial procedure we use for the presentation of arguments on the merits. *Cf. Grant v. United States Air Force,* 197 F.3d 539, 543 n. 6 (D.C.Cir.1999) ("our caselaw makes clear that an argument first made in the reply comes too late"). Henceforth, therefore, a petitioner whose standing is not selfevident should establish its standing by the submission of its arguments and any affidavits or other evidence appurtenant thereto at the first appropriate point in the review proceeding. In some cases that will be in response to a motion to dismiss for want of standing; in cases in which no such motion has been made, it will be with the petitioner's opening brief—and not, as in this case, in reply to the brief of the respondent agency.* In either procedural context the petitioner may carry its burden of production by citing any record evidence relevant to its claim of standing

---

* The Sierra Club appears already to have recognized the virtue in establishing its standing at the outset of a case. In *Sierra Club v. EPA,* 294 F.3d 155 (D.C.Cir.2002), which was filed in this court eight days after the instant petition, the Sierra Club appended to its opening brief the declarations of two members and one employee in order to provide facts sufficient to support the Club's standing to sue. The EPA found no cause to question the petitioner's standing, and the litigants focused their attention instead upon the merits of the case.

and, if necessary, appending to its filing additional affidavits or other evidence sufficient to support its claim. In its opening brief, the petitioner should also include in the "Jurisdictional Statement" a concise recitation of the basis upon which it claims standing.

Requiring the petitioner to establish its standing at the outset of its case is the most fair and orderly process by which to determine whether the petitioner has standing to invoke the jurisdiction of the court. The facts upon which a petitioner relies for its standing to sue are necessarily peculiar to it and are ordinarily within its possession; indeed it is often the case, as here, that some of the relevant facts are known only to the petitioner, to the exclusion of both the respondent and the court. Yet all too often the petitioner does not submit evidence of those facts with its opening brief and the respondent is therefore left to flail at the unknown in an attempt to prove the negative, *see, e.g., D&F Afonso Realty Trust v. Garvey,* 216 F.3d 1191, 1194 (D.C.Cir.2000) (agency challenged standing, which challenge petitioner readily overcame when "afforded . . . the opportunity [after oral argument] to submit affidavits supporting its allegations"); *Chlorine Chem. Council v. EPA,* 206 F.3d 1286, 1289 (D.C.Cir.2000) (agency that had challenged standing later "cede[d] that 'the discussion of standing at oral argument indicates that petitioners may indeed meet minimum requirements for standing' "); or the court raises its own question about the petitioner's standing and ends up having to direct the parties to file supplemental briefs in order to ensure that the issue is joined in a fair and thorough adversarial process, *see, e.g., Gettman v. DEA,* 290 F.3d 430, 432–33 (D.C.Cir.2002); *Town of Stratford v. FAA,* 285 F.3d 84, 87–88 (D.C.Cir.2002); *Ruggiero v. FCC,* 278 F.3d 1323, 1327 (D.C.Cir. 2002). When, as will often be the case henceforth, the petitioner shows in its

opening brief that its claim to standing is beyond serious question, neither the respondent nor the court will have reason to pursue the issue further. At the same time, a respondent that continues to contest the petitioner's claim to standing will have the opportunity to make an informed response to the petitioner's showing, and the petitioner then will have an opportunity to reply to that objection in its reply brief.

■ In this case counsel, having been given an additional opportunity to demonstrate the Sierra Club's standing, supplied the court with his own submission, to which were attached two lists each of 14 mailing addresses, 33 maps, and the Declaration of H.C. Clark, a Professor Emeritus at Rice University who has "taught about geology, geophysics, and environmental problems." The submission of counsel describes the injuries allegedly suffered by Sierra Club members because of the Chlorinated Aliphatics Rule, including the claim that members forego recreation in the vicinity of a plant generating the EDC/VCM sludge "due to their concern for exposure." The allegations in this submission, however, do not support the standing of the Sierra Club because, like the "mere allegations" in the Sierra Club's brief, they are not evidence. That these particular allegations concern matters beyond the scope of counsel's personal knowledge — the concerns of the unidentified Sierra Club members, for example — serves only to illustrate why we require more than representations of counsel in order to establish a complainant's standing.

The lists attached to the submission comprise 28 street addresses, each purportedly that of a Sierra Club member, but there is no indication that a member resided at that address when the Club filed the petition challenging the Rule and resides there at present. The lists may be "evi-

dence," but they are "legally insufficient" to demonstrate that at least one member of the organization lived at the time of filing and continues to live in a place affected by the Rule. *American Petroleum,* 216 F.3d at 64.

The maps attached to the counsel's submission show that each of the 28 listed addresses is located within five miles of either a chemical facility in LaPorte, Texas that generates EDC/VCM sludge or a landfill in Houston, Texas at which sludge is disposed. The Sierra Club does not submit any evidence, however, supporting the proposition that there is a "substantial probability" of "actual or imminent" injury to its members arising from their residing within five miles of the generating or the disposal facility. *American Petroleum,* 216 F.3d at 63. Taken together, therefore, the address lists and the maps do not establish the organization's standing to sue.

The affidavit of Professor Clark recounts that he has reviewed public records maintained by the Texas Natural Resources Conservation Commission concerning the landfill depicted on some of the submitted maps, and that "[t]hose records indicate that contamination in the ground water under and from the BFI landfill has migrated into Greens Bayou." The relevance of the just-quoted fact is not clear from any of the evidence the Club submitted. More curious still, Professor Clark refers generally to a "plume of contamination that is moving into Greens Bayou [and] includes petroleum related organic chemicals," but he makes no mention whatsoever of EDC/VCM sludge, nor does he suggest the current or imminent presence in the Bayou of the toxic constituents in such sludge. Perhaps that is because the Clark Affidavit was created for the Sierra Club to submit to this court in a prior case unrelated to the present proceeding, and indeed, unrelated to the Chlo-

rinated Aliphatics Rule. *See American Petroleum,* 216 F.3d at 65 ("Clark establish[es] little more than that some types of petroleum-related organic chemicals migrate from BFI's Houston landfill to the Greens Bayou, and ... [t]his is insufficient to establish the environmental petitioner's standing"). Recycling this affidavit does not help to demonstrate the Sierra Club's standing to sue in this case any more than it did in the prior case.

In sum, the Sierra Club has failed to demonstrate a substantial probability of injury to a single member; it does nothing to explain how a member is likely to be affected by the generation, storage, or disposal of EDC/VCM sludge as provided under the Rule. Therefore, the Sierra Club has not shown that it has standing to seek review of the Rule.

B. The Environmental Technology Council

■ We do not address the ETC's standing under Article III of the Constitution because it is clear the Council lacks prudential standing under the RCRA. *See Hazardous Waste Treatment Council v. Thomas,* 885 F.2d 918, 921 & n. 2 (D.C.Cir. 1989) (*HWTC IV*); *see also Galvan v. Federal Prison Indus., Inc.,* 199 F.3d 461, 463 (D.C.Cir.1999) ("[L]ater cases make clear what was implicit in *Steel Co. [v. Citizens for a Better Env.,* 523 U.S. 83, 94–95, 118 S.Ct. 1003, 1012–13, 140 L.Ed.2d 210 (1998)]: There is an array of nonmerits questions that we may decide in any order"). To demonstrate prudential standing, ordinarily a party must show that the interest it seeks to protect is "arguably within the zone of interests to be protected or regulated by the statute ... in question." *Ass'n of Data Processing Serv. Orgs. v. Camp,* 397 U.S. 150, 153, 90 S.Ct. 827, 830, 25 L.Ed.2d 184 (1970).

The ETC, which describes itself as "a national trade association of commercial firms that provide technologies and services for recycling, treatment, and secure disposal of industrial and hazardous wastes; firms involved in the cleanup of contaminated sites; and equipment manufacturers serving the environmental market," makes no attempt to show that the Congress intended the RCRA to protect interests of its sort, either directly or as a proxy for the environmental interests of the public for whose protection the Act was presumably passed. In fact, the ETC does not even state, either in its briefs or by way of affidavit, what interest it has in this litigation. If the past is any guide, however, the interest of the ETC is, by promoting ever more stringent regulation, "to improve the business opportunities of treatment firms" — an end we have consistently and repeatedly held lies outside the "zone of interests" protected by the RCRA. *HWTC IV*, 885 F.2d at 925–26; *accord, Cement Kiln Recycling Coalition v. EPA*, 255 F.3d 855, 871 (D.C.Cir.2001); *HWTC II*, 861 F.2d at 285. The Council offers us no reason to conclude that its case for prudential standing is any stronger here.

### III. Conclusion

For the foregoing reasons, the petition is dismissed.

*So ordered.*