# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued February 13, 2012          Decided July 20, 2012

No. 10-1107

NATIONAL CHICKEN COUNCIL, ET AL.,
PETITIONERS

v.

ENVIRONMENTAL PROTECTION AGENCY,
RESPONDENT

GROWTH ENERGY, ET AL.,
INTERVENORS

———

On Petition for Review of Final Agency Action
of the Environmental Protection Agency

———

*Catherine E. Stetson* argued the cause for petitioners National Chicken Council, National Meat Association, and National Turkey Federation. With her on the briefs were *Mary Helen Wimberly*, *William L. Wehrum*, and *Lewis F. Powell III*.

*James B. Dougherty*, *Jonathan F. Lewis*, *Helen D. Silver*, and *Ann B. Weeks* were on the briefs for petitioners Friends of the Earth, Inc. and National Wildlife Federation.

*Daniel R. Dertke*, Attorney, U.S. Department of Justice, argued the cause for respondent. With him on the brief was *Ignacia S. Moreno*, Assistant Attorney General.

*John C. O'Quinn* argued the cause for intervenors in support of respondent. With him on the brief were *William H. Burgess*, *David B. Salmons*, *Sandra P. Franco*, *Bryan M. Killian*, *Charles H. Knauss*, *Shannon S. Broome*, *Christopher D. Jackson*, *Alex D. Menotti*, *Roger R. Martella, Jr.*, *Thomas G. Echikson*, and *Rachel D. Gray*. *Jeffrey B. Clark, Sr.*, *Stuart A. Drake*, and *Thomas R. Lotterman* entered appearances.

*Alan Kashdan* was on the brief for *amicus curiae* Government of Canada in support of respondent.

Before: HENDERSON, BROWN, and KAVANAUGH, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* BROWN.

BROWN, *Circuit Judge*: The National Chicken Council, National Meat Association, and National Turkey Federation petition for review of EPA's interpretation of a provision in the Energy Independence and Security Act of 2007 ("EISA"). Because the petitioners fail to show that a favorable ruling would redress their claimed injuries, we dismiss their petition on standing grounds.[1]

---

[1] This consolidated appeal originally also included Friends of the Earth's and National Wildlife Federation's petitions for review, but we granted their motion to voluntarily dismiss their petitions on February 10, 2012.

The EISA directed EPA to promulgate regulations ensuring that transportation fuel sold in the United States contains certain minimum levels of renewable fuel on an average annual basis. *See* 42 U.S.C. § 7545(o)(2)(A)(i), (o)(2)(B)(i). To fulfill that mandate, EPA modified its existing trading program, under which producers generate credits called Renewable Identification Numbers ("RINs") for each gallon of renewable fuel. *See* 40 C.F.R. § 80.1426. EPA required refiners and importers of transportation fuel to purchase the number of RINs needed to satisfy their proportional share of the EISA's annual targets. *See* 75 Fed. Reg. 14,670, 14,676 (Mar. 26, 2010).[2]

Ethanol qualifies as a "renewable fuel" under certain circumstances. Ethanol from a production plant that commenced construction after December 19, 2007 (the date of the EISA's enactment) counts as renewable fuel if it "achieves at least a 20 percent reduction in lifecycle greenhouse gas emissions" in comparison to fossil fuels. 42 U.S.C. § 7545(o)(2)(A)(i). Ethanol from a plant that commenced construction on or before December 19, 2007 is not subject to that requirement; it counts as renewable fuel whether it reduces emissions or not. *Id.* In policy speak, these older ethanol plants are "grandfathered in."

The statutory provision at issue in this case is an extension of the EISA's grandfather clause. It states that, "[f]or calendar years 2008 and 2009, any ethanol plant that is fired with natural gas, biomass, or any combination thereof is

---

[2] For example, in 2012, the EISA's annual renewable fuel target is 15.2 billion gallons. 42 U.S.C. § 7545(o)(2)(B)(i)(I). If a company produces 10% of all transportation fuel produced in the United States in 2012, then that company would have to obtain RINs equivalent to 10% of the EISA's 2012 renewable fuel target, or 1.52 billion gallons. *See* 75 Fed. Reg. at 14,676.

deemed to be in compliance . . . with the 20 percent reduction requirement [in 42 U.S.C. § 7545(o)(2)(A)(i)]." 42 U.S.C. § 7545, Transition Rules. In its Notice of Proposed Rulemaking, EPA claimed the provision was ambiguous because it did "not specify whether [ethanol plants fired with natural gas and/or biomass] are deemed to be in compliance only for the period of 2008 and 2009, or indefinitely." 74 Fed. Reg. 24,904, 24,925 (May 26, 2009). After considering public comments, EPA adopted the latter interpretation in its Final Rule. It read the provision to mean that ethanol plants fired with natural gas and/or biomass that commenced construction in 2008 or 2009 ("qualifying ethanol plants") are deemed compliant with the 20 percent greenhouse gas reduction requirement "indefinitely." 75 Fed. Reg. at 14,688. Functionally, that meant qualifying ethanol plants could generate RINs indefinitely without having to ensure that their ethanol met the emissions-reduction requirement.

The petitioners argue EPA's interpretation of the provision is inconsistent with the statutory text, and they ask us to set it aside. To establish their Article III standing to seek such relief, they must show that they have suffered (or will soon suffer) a "concrete" injury in fact; that their injury is or will be "fairly . . . trace[able]" to EPA's interpretation of the provision; and that there is a "substantial likelihood" their injury would be redressed if we set EPA's interpretation aside. *Vermont Agency of Natural Res. v. United States ex rel. Stevens*, 529 U.S. 765, 771 (2000).

The petitioners represent members of the meat industry who purchase corn to use as animal feed. Their theory of injury rests on three factual claims: (1) by permitting qualifying ethanol plants to generate RINs indefinitely without having to meet the emissions-reduction requirement, EPA's interpretation of the provision will lead qualifying

ethanol plants to produce more ethanol than they otherwise would have; (2) this increase in ethanol production by qualifying ethanol plants will lead to an increase in the overall demand for corn; and (3) this increase in overall corn demand will lead to an increase in the price of corn. The petitioners contend their injury would be redressed if we vacated EPA's interpretation because a narrower interpretation would cause qualifying ethanol plants to reduce ethanol production, thereby decreasing corn demand and reducing the price of feed.

After oral argument, we ordered the parties to submit supplemental briefs (and affidavits, if needed) on standing. *See* Feb. 14, 2012 Order. As we stated in that Order, under *Sierra Club v. EPA*, 292 F.3d 895, 899 (D.C. Cir. 2002), the petitioners can only meet their burden of proof on the redressability element of standing if they "set forth specific facts in the form of an affidavit or other evidence which show a substantial probability that vacatur of [EPA's interpretation] would cause corn prices to [fall]." Feb. 14, 2012 Order, at 1.

We now find the petitioners have fallen short. If we were to vacate EPA's interpretation, the only consequence for qualifying ethanol plants is that they would no longer be able to generate RINs without complying with the EISA's emissions-reduction requirement. The petitioners fail to show a "substantial probability" that qualifying ethanol plants would reduce their ethanol production as a result of that change. True, EPA claimed in the Final Rule that "many of the current technology corn ethanol plants may find it difficult if not impossible to retrofit existing plants to comply with the 20 percent [greenhouse gas] reduction threshold," and that "[g]iven the difficulty of meeting such threshold, owners of such facilities could decide to shut down the plant." 75 Fed. Reg. at 14,689–90. But that statement referred to all

grandfathered plants, not just the qualifying ethanol plants, and there are good reasons to think the qualifying ethanol plants will find it much easier than the other, older grandfathered plants to meet the emissions-reduction requirement should they have to. *See* Declaration of Geoff Cooper, ¶ 9 (deeming it "very likely" the qualifying ethanol plants could meet the emissions-reduction requirement because of their more advanced and eco-friendly processes).

The petitioners also cite several comments ethanol producers submitted during the rulemaking proceeding. *See* Petitioners' Supplemental Br. 2–4. These comments assert it would be difficult to retrofit ethanol plants to meet the emissions-reduction requirement, but the comments do not satisfy the petitioners' burden of proof for one of two reasons: they are either not specific to qualifying ethanol plants, or they do not claim ethanol plants would be forced to shut down or reduce production if they had to comply with the emissions-reduction requirement to generate RINs. Read most generously for the petitioners, the comments establish that some *grandfathered* ethanol plants might struggle to meet the emissions-reduction requirement, and some of those plants might be forced to shut down as a result. They do not establish a substantial probability that *qualifying ethanol plants* would be forced to close down or reduce corn demand, and they are not nearly as strong as the evidence found sufficient to confer standing in *Duke Power Co. v. Carolina Environmental Study Group, Inc.*, 438 U.S. 59 (1978), the case on which the petitioners rely most heavily.

We should not be understood to foreclose any challenge to EPA's interpretation of the provision; a different petition, properly supported, could allow us to address the merits of EPA's reading. But the petitioners here have failed to

establish their standing, and their petition for review is accordingly

*Dismissed.*