**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**October 22, 2013**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

## UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

---

NORTHERN LARAMIE RANGE
ALLIANCE,

      Petitioner,

v.

FEDERAL ENERGY REGULATORY
COMMISSION,

      Respondent.

No. 12-9567
(Petition for Review)

---

**PETITION FOR REVIEW**
**FROM THE FEDERAL ENERGY REGULATORY COMMISSION**
**(F.E.R.C. No. EL 11-51-001)**

---

Kenneth G. Lay, Glenrock, Wyoming (Alyson Meyer Gould, Holsinger Law, Denver, Colorado, with him on the briefs) for Petitioner.

Karin L. Larson, Solicitor, Federal Energy Regulatory Commission, Office of General Counsel, Washington, D.C. (David L. Morenoff, Solicitor, Federal Energy Regulatory Commission, Office of General Counsel, Washington, D.C.; and Robert Harris Solomon, Solicitor, Federal Energy Regulatory Commission, Office of General Counsel, Washington, D.C., with her on the briefs) for Respondent.

---

Before **BRISCOE**, Chief Circuit Judge, **SEYMOUR**, and **BACHARACH**, Circuit Judges.

---

**BACHARACH**, Circuit Judge.

This action grew out of efforts by Wasatch Wind Intermountain, LLC to establish two wind energy projects. Wasatch was able to sell the wind energy by certifying both projects as qualifying facilities. These efforts drew the ire of the Northern Laramie Range Alliance, which objected to Wasatch's certification. The Federal Energy Regulatory Commission (FERC) rejected the objections, and the Alliance appeals FERC's decision.

We can entertain the appeal only if the Alliance has established standing, which requires traceability and redressability. For both, the Alliance relies on increases in electricity rates. But the wind projects have not been completed, Wasatch has not found a buyer for the anticipated wind power, and we do not know whether sales of wind energy would increase or decrease a utility's costs. Even beyond these uncertainties, electricity rates depend on the actions of third parties, those of the utility and the state regulatory commission. With the multitude of uncertainties surrounding the effect of Wasatch's certification or decertification on electricity rates, we conclude that the Alliance has not shown either traceability or redressability. We therefore dismiss the petition for lack of standing.

I.    **Background**

The issues of traceability and redressability require us to examine:

- the relationship between the Alliance, Rocky Mountain Power, and Wasatch,

- the regulatory framework underlying Wasatch's certification,

- the regulatory concept of "avoided costs," and

- the administrative proceedings that resulted in the existing electricity rates.

## A. The Relationship Between Alliance, Rocky Mountain Power, and Wasatch

Our analysis of standing begins with the relationship among the Alliance, Rocky Mountain Power, and Wasatch. Many Alliance members buy their electricity from Rocky Mountain Power, which had two contracts with Wasatch. One contract terminated before the appeal, and the other contract ended during the pendency of the appeal. Following termination of the contracts, Wasatch has yet to complete the facilities or find a buyer for the wind energy.

## B. The Regulatory Framework

The relationship among the Alliance, Rocky Mountain Power, and Wasatch must be viewed against the backdrop of the regulatory framework. That framework is designed to encourage production of alternative sources of energy such as wind power.

The regulatory framework grew out of the Public Utilities Regulatory Policies Act (PURPA). *See F.E.R.C. v. Mississippi*, 456 U.S. 742, 746-47 (1982). Through the Act, Congress attempted to promote renewable energy sources by requiring utilities to buy power from small facilities that met criteria established by the statute and FERC. *See Am. Paper Inst., Inc. v. Am. Elec. Power Serv.*

3

*Corp.*, 461 U.S. 402, 405-06 (1983); 16 U.S.C. § 796(17)(A)-(E). If a producer of wind power believes it satisfies the statutory criteria, it can certify compliance. 18 C.F.R. § 292.207(a). Wasatch certified compliance, and that certification drew continued opposition by the Alliance.

The opposition stems from the statutory cap of 80 megawatts on the volume of wind power that a production facility can generate and still be considered small enough to qualify for statutory benefits. 16 U.S.C. § 796(17)(A)(ii). Though Wasatch regards itself as the developer of two separately qualifying small-production facilities, the Alliance disagrees. This disagreement stems from a dispute over whether Wasatch plans to develop a single facility or two facilities. Wasatch plans to develop two turbine clusters, and they will be considered parts of the same facility if they are located within a mile of each other. 18 C.F.R. § 292.204(a)(2)(i)-(ii). But the clusters will be more than a mile apart.

Wasatch considered the planned clusters to be two separate facilities and certified their compliance with the required criteria. This certification triggered Rocky Mountain Power's obligation under PURPA to buy the output of wind energy produced by Wasatch at the two sites. 16 U.S.C. § 824a-3(a)(2); 18 C.F.R. § 292.303(a). In carrying out this obligation, Rocky Mountain Power entered into 20-year agreements for each wind project in 2010. But for Wasatch's self-certification, Rocky Mountain Power would not have signed these agreements with Wasatch.

4

C.      **Rocky Mountain Power's "Avoided Costs"**

To determine the effect of Wasatch's certification on Alliance members, we must understand how the regulations affect rates. The effect stems from a statutory inducement for a small power-production facility: When the facility satisfies the statutory and regulatory criteria, it can force a utility to buy the energy for its "avoided cost." 16 U.S.C. § 824a-3(a)-(b), (d); 18 C.F.R. §§ 292.101(b)(6), 292.303(a), 292.304(a)(2). This cost is the incremental cost the utility would have paid to generate or purchase that electricity from another source. 18 C.F.R. § 292.101(b)(6); *see* 16 U.S.C. § 824a-3(d).

D.      **Administrative Proceedings in the Wyoming Commission and the Eventual Agreement**

Ultimately, it was up to the Wyoming Public Service Commission to determine Rocky Mountain Power's avoided costs. *See* 16 U.S.C. § 824a-3(f). According to the Alliance, the Commission calculated these costs in a manner that required rate increases. This argument requires us to understand how the Wyoming Commission ultimately decided on the existing rates.

These rates were set as Rocky Mountain Power was experiencing increases in its own costs. Rocky Mountain Power tried to offset these cost increases by raising rates charged to consumers. But a rate increase required approval of the Wyoming Public Service Commission.

5

So, Rocky Mountain Power applied for a rate hike, listing its contracts and explaining its increase in costs. Some parties objected, and the regulatory proceedings ended in 2012 with a stipulation. In the eventual stipulation, Rocky Mountain Power agreed to reduce the amount of the rate increase by over $12,000,000. *In re Rocky Mountain Power*, 2012 WL 6700584, at \*1-\*2 (Wyo. Pub. Serv. Comm'n Oct. 8, 2012) (unpublished). But that settlement does not supply any information about the ultimate effect of the Wasatch contracts on electricity rates.

## II. Article III Standing Analysis

Some standing requirements are based on Article III of the constitution, and others are based on prudential considerations. We need not analyze prudential standing if the claimant lacks standing under Article III. *See Wyoming v. U.S. Dep't of Interior*, 674 F.3d 1220, 1231 (10th Cir. 2012); *Mount Evans Co. v. Madigan*, 14 F.3d 1444, 1451 (10th Cir. 1994). We hold that the Alliance has not satisfied two constitutional requirements of standing: traceability and redressability.

### A. Burden of Persuasion

The party invoking federal jurisdiction bears the burden of establishing traceability and redressability. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). To satisfy this burden, the Alliance must not only satisfy the pleading requirements but also provide support "with the manner and degree of evidence

6

required at the successive stages of litigation." *Id.* The resulting question is how to define this burden when we entertain a direct appeal from an administrative decision.

The Seventh, Eighth, and D.C. Circuit Courts of Appeals have defined this burden by analogizing the appeal to a summary judgment motion brought by the petitioner. *Iowa League of Cities v. EPA*, 711 F.3d 844, 869-70 (8th Cir. 2013); *Citizens Against Ruining the Env't v. EPA*, 535 F.3d 670, 675 (7th Cir. 2008); *Sierra Club v. EPA*, 292 F.3d 895, 899-900 (D.C. Cir. 2002). These courts hold that the petitioner must supply evidence to show traceability and redressability. *Iowa League of Cities*, 711 F.3d at 869-70; *Citizens Against Ruining the Env't*, 535 F.3d at 675; *Sierra Club*, 292 F.3d at 899-900.

This approach is based on the similarity of the proposed remedy when a claimant seeks summary judgment in district court and appeals an administrative decision to our court. In both situations, the claimant is seeking a final judgment on the merits. *Iowa League of Cities*, 711 F.3d at 869-70; *Sierra Club*, 292 F.3d at 899. Because of the similarity in the proposed remedy, other circuits have used the summary-judgment standard to define a petitioner's burden of production when standing is disputed in an administrative appeal to a federal appellate court. *Iowa League of Cities*, 711 F.3d at 869-70; *Sierra Club*, 292 F.3d at 899.

We agree with this reasoning and follow the approach taken by the Seventh, Eighth, and D.C. Circuit Courts of Appeals. Thus, the Alliance must produce

7

evidence on each element of standing as if it were moving for summary judgment in district court. To prove these elements, the Alliance must proffer "specific facts" supported by "affidavit or other evidence." *Lujan*, 504 U.S. at 561. If FERC contests these facts, the Alliance would not enjoy "the benefit of any inference" and it would need to satisfy its burden of persuasion under a preponderance-of-the-evidence standard. *See Iowa League of Cities*, 711 F.3d at 870.

This proof must show that the Alliance had standing when it filed its petition for review. *See Nova Health Sys. v. Gandy*, 416 F.3d 1149, 1154 (10th Cir. 2005); *see also Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180 (2000) ("[W]e have an obligation to assure ourselves that [plaintiff] had Article III standing at the outset of the litigation.").

### B.      Traceability

The Alliance bases standing solely on the belief that the Wyoming Public Service Commission has approved a rate increase as a result of the certification that Wasatch had met the FERC criteria. But that certification does not affect electricity rates. Instead, electricity rates are determined by the actions of two third-parties: Rocky Mountain Power and the Wyoming Public Service Commission. Thus, electricity rates are traceable to Wasatch's certification only if:

8

- Rocky Mountain Power sought higher rates as a result of the certification and

- the Wyoming Public Service Commission allowed Rocky Mountain Power to increase rates because of an agreement to buy wind power from Wasatch.

The Alliance has not shown a likelihood that electricity rates increased because of Wasatch's certification. As a result, the Alliance has not satisfied its burden of persuasion.

### 1. The Test for Traceability

Standing exists only if the injury is "'fairly . . . trace[able] to the challenged action of the defendant . . . and not . . . th[e] result [of] the independent action of some third party not before the court.'" *Lujan*, 504 U.S. at 560 (citation omitted). But here, the injury "depends on the unfettered choices made by independent actors," Rocky Mountain Power and the Wyoming Commission. *ASARCO Inc. v. Kadish*, 490 U.S. 605, 615 (1989). Thus, the Alliance must show that Rocky Mountain Power and the Commission increased rates because of Wasatch's certification. *See Lujan*, 504 U.S. at 561-62. Traceability is absent when we have to guess why the third parties acted as they did. *See Clapper v. Amnesty Int'l USA*, __ U.S. __, 133 S. Ct. 1138, 1149 (2013) (traceability is lacking because the respondents could only guess at the authority for the government's interception of their communications); *Nova Health Sys. v. Gandy*, 416 F.3d 1149, 1157 (10th Cir.

2005) (traceability is lacking because it was "merely speculative whether these defendants caused Nova's decision").

### 2. The Alliance's Arguments for Traceability

In an effort to minimize this guesswork, the Alliance argues that rates have already been raised because of one of the Wasatch contracts. This argument is based on four supposed facts: (1) Wyoming's electricity rates "are grounded in a determination of the revenue required for a utility to meet its expenses, plus a stipulated return;"[1] (2) Rocky Mountain Power presented the Commission with the cost of one of the wind projects;[2] (3) the Commission approved the entire stipulated rate increase;[3] and (4) Rocky Mountain Power was utilizing all of its transmission capacity.[4] In the Alliance's view, Rocky Mountain Power's rates are tied to a specific rate of return and the Commission approved the entire stipulated increase. Therefore, according to the Alliance, the Wasatch costs contributed to the eventual rate increase.

---

[1]   Pet'r's Supp. Resp. Br. at 4.

[2]   Sarvey Aff. at 2, Ex. 2.

[3]   *In re Rocky Mountain Power*, 2012 WL 6700584, at *6 (Wyo. Pub. Serv. Comm'n Oct. 8, 2012) (unpublished).

[4]   Pet'r's Reply Br. at 6.

10

3. The Flaws in the Alliance's Arguments

The Alliance cannot tie the rate increase to the costs of the wind projects because: (1) Wasatch's contracts were relatively insignificant compared to Rocky Mountain Power's other costs, (2) certification would have affected the existing rates only if the Wyoming Commission had unnecessarily allowed Rocky Mountain Power to charge higher rates, and (3) the Alliance provides no explanation or support for its argument that Rocky Mountain Power was utilizing all of its transmission capacity. In addition, the Alliance's underlying argument on the merits assumes that a second turbine cluster would be built. If it would not, certification of the single project would have been appropriate even if the Court were to adopt the Alliance's position on the merits.

Wasatch's Minuscule Share of Rocky Mountain Power's
Production Costs

The Alliance's argument is flawed in that it assumes that Rocky Mountain Power requested and obtained a rate increase based on the cost of a single contract, which accounted for less than 1% of the production costs.[5] We have no reason to connect this tiny portion of Rocky Mountain Power's costs to the eventual rate increase.

---

[5] Rocky Mountain Power's long-term purchases totaled $445,990,114 and the net power cost for the wind project is $3,772,711 (about 0.85% of the total). Sarvey Aff., Ex. 2.

11

The Assumption that the Wyoming Commission Allowed
Rocky Mountain Power to Pass Along Excessive Rates to
Consumers

In addition to attributing the rate increase to a supplier that accounts for less than 1% of the costs, the Alliance erroneously assumes that the Wyoming Public Service Commission allowed Rocky Mountain Power to charge excessive rates to consumers.

The Alliance's argument, connecting the rate increase to the Wasatch contract, rests on three assumptions:

- The connection assumes that the Wyoming Public Service Commission allowed Rocky Mountain Power to charge ratepayers higher costs because it had assumed them in the Wasatch contracts;

- the connection further assumes that wind power is more expensive than conventional energy sources; and

- the connection also assumes that the eventual settlement included a rate hike based on an increase in costs from the Wasatch contract.

The Alliance's first assumption is that a third party (the Wyoming Public Service Commission) would allow another third party (Rocky Mountain Power) to pass on higher costs resulting from the Wasatch contracts. This assumption involves a series of related assumptions that ultimately depended on the actions of two third-parties: Rocky Mountain Power and the Wyoming Public Service Commission.

In 2009, Rocky Mountain Power entered into a stipulation with various interested parties, which was approved with some modifications by the Wyoming

12

Public Service Commission.   Pet'r's Supp. Resp. Br., Ex. H at 2-3; *In re Rocky Mountain Power*, 2009 WL 6357879, at *11 (Wyo. Pub. Serv. Comm'n Nov. 30, 2009) (unpublished).  The stipulation provided a formula for the prices that Rocky Mountain Power would pay Wasatch for its wind power.  This formula contained a "wind proxy," which set Wasatch's prices based on market prices for wind energy.  According to the Alliance, the wind proxy contained prices higher than those for energy from conventional sources, such as natural gas.  But at that point, rates had not yet been affected because the Wyoming Public Service Commission had not yet decided whether to allow Rocky Mountain Power to pass along all of its costs to ratepayers.  That decision was still three years away.

When the subject of a rate increase arose, the Wyoming Public Service Commission had discretion about which costs could be passed along to ratepayers.  With this discretion, the Wyoming Commission had to decide whether to allow Rocky Mountain Power to pass along to ratepayers the higher wind costs approved three years earlier.  In deciding how to exercise this discretion, the Wyoming Commission was not constrained by federal law or Wasatch's certification of its projects.

When the Wyoming Commission approved rates in 2012, it did so based on its own exercise of discretion to allow Rocky Mountain Power to pass along its higher costs to consumers.  That was the prerogative of the Commission, but it

13

involved a step that was not causally related to certification of the Wasatch projects.

Second, the Alliance implicitly assumes that projected costs of wind power would exceed those of conventional energy sources. This assumption is essential to the Alliance's argument: If wind power costs the same as conventional sources of power, for example, Rocky Mountain Power's projected expenses would have been the same with or without the Wasatch contract. But the Alliance proffered no evidence comparing the costs of wind power and other sources of energy.

The third assumption is that the eventual rates were calculated based on the cost of the Wasatch contract. Though the Wyoming Commission ultimately approved a rate increase, these rates resulted from a settlement. In this settlement, Rocky Mountain Power dropped its proposed rate increase by over $12,000,000 without identifying how the compromise had been calculated. Thus, we have no way of knowing whether the use of a wind proxy had any effect on the eventual rates.

The Alliance's argument, connecting rates and the Wasatch contract, is based on three questionable assumptions. Underlying these assumptions is a need for guesswork that is fatal to the Alliance's argument on traceability.

14

The Alliance's Assertion that Rocky Mountain Power Lacked
"Unutilized Transmission Capacity" for Wasatch's Wind Power

The Alliance also urges a link between the certification and the eventual rates based on Rocky Mountain Power's lack of any "unutilized transmission capacity" to deliver Wasatch's wind energy. Pet'r's Reply Br. at 6. But the Alliance provides no explanation or support for: (1) its assertion that Rocky Mountain Power had no unutilized transmission capacity for Wasatch's wind power, or (2) how the absence of unutilized transmission capacity would cause an increase in electricity rates.

In its reply brief, the Alliance points to an unsworn allegation that Rocky Mountain Power's chief executive officer had told an Alliance representative as late as mid-2010 that there was no capacity in the system to accept additional power generation. Pet'r's Reply Br. at 6; *see* Agency Record, Item No. 2 at 2-3. The unsworn statement, however, is only an allegation; it is not evidence.

The Alliance's allegation appears questionable, for Rocky Mountain Power stated in mid-2010 that it was investing in Wyoming to develop transmission systems so that the company could develop economic wind projects. *In re Rocky Mountain Power*, 2010 WL 3743887, at *4-*5 (Wyo. Pub. Serv. Comm'n July 29, 2010). But, we need not decide here whether Rocky Mountain Power would have added transmission lines even without the Wasatch contract. In assuming that these lines would not have been added, the Alliance provides no evidence; and that

15

absence of evidence is fatal because the Alliance bears the burden of persuasion. Accordingly, we reject the Alliance's argument involving the supposed absence of any unutilized transmission capacity for Wasatch's wind power.

> The Alliance's False Assumption that Wasatch Would Timely Build the Second Turbine Cluster

The Alliance's argument on traceability not only assumes a connection between certification and rates, but also assumes that Wasatch will build the second turbine cluster. If Wasatch does not do so, it would be left with only one cluster; and the Alliance does not question FERC's right to certify only one of Wasatch's turbine clusters.

Though we must base the Alliance's assumption on the possibilities existing when the appeal began, we cannot help but notice that Wasatch has not yet built the second cluster. Indeed, it was Wasatch's failure to build the second cluster that led Rocky Mountain Power to terminate the sole remaining contract. With that history in mind, we cannot lightly assume that the building of the second cluster would have been considered inevitable when the Alliance began this action.

### 4. Conclusion

Did Wasatch's relatively small supply of energy affect the costs that Rocky Mountain Power was allowed to pass on to ratepayers? We have no way of

knowing. And, as a result, the Alliance has failed to satisfy its burden on traceability.

## C. **Redressability**

The Alliance has also failed to satisfy its burden on redressability.

### 1. Test for Redressability

The injury is redressable only if a favorable decree (an order requiring decertification) would likely provide redress. *See Lujan*, 504 U.S. at 561. This inquiry turns on what Rocky Mountain Power and the Wyoming Commission would do if the Wasatch projects were decertified. And there is no way of knowing what they would do.

### 2. The Alliance's Failure to Show a Likelihood of Lower Rates from Decertification

If the projects are decertified, the Alliance predicts that Rocky Mountain Power would refuse to buy wind power from Wasatch and reduce costs through this refusal. But Rocky Mountain Power's rates have already been approved. In light of this approval, we have no reason to expect a voluntary or involuntary rate reduction even if Wasatch were to lose its certification.

A voluntary reduction appears unlikely because Rocky Mountain Power would lack any apparent incentive to drop rates based on elimination of less than 1% of its budgeted net power costs.

17

An involuntary rate reduction appears equally unlikely: Why would the Wyoming Public Service Commission require a rate reduction when: (1) the Wasatch contract affected less than 1% of Rocky Mountain Power's forecasted costs, and (2) Rocky Mountain Power agreed to drop its proposed rate hike by over $12,000,000 and the Wasatch contract would have accounted for less than $4,000,000? In these circumstances, we cannot possibly know what the Wyoming Commission would do with Rocky Mountain Power's rates if Wasatch were to lose certification. And without knowing whether the Commission would revisit the rates already approved, we conclude that the Alliance has not satisfied its burden on redressability. *See Klamath Water Users Ass'n v. F.E.R.C.*, 534 F.3d 735, 739-40 (D.C. Cir. 2008) (an increase in electricity rates was not redressable because the challengers had not shown that utilities would lower electricity rates, reasoning that the state regulators had already set retail rates); *Burton v. Cent. Interstate Low-Level Radioactive Waste Compact Comm'n*, 23 F.3d 208, 210 (8th Cir. 1994) (a ratepayer allegedly incurring an increase in electricity rates would lack standing to challenge regulatory action because even with a favorable decree, the utility might or might not adjust its rates); *Starbuck v. City & Cnty. of San Francisco*, 556 F.2d 450, 458 (9th Cir. 1977) (ratepayers lacked standing to challenge a utility's use of transmission lines, though the ratepayers alleged a desire to reduce electricity rates, because of uncertainty about the rates with a favorable decree).

18

3. The Alliance's Failure to Show Likely Savings to Ratepayers if Wasatch Were to Lose Certification

The Alliance suggests that decertification could benefit ratepayers because they would obtain a part of the savings if Rocky Mountain Power's expenses dip below a certain level. This is indeed a possibility, for ratepayers would receive 70% of the savings if Rocky Mountain Power's actual net power costs dip below the projections. Pet'r's Supp. Resp. Br., Ex. C at 6. And one might imagine the possibility that ratepayers could enjoy a fraction of the savings if Rocky Mountain Power could cut expenses.

One such cut, the Alliance imagines, is the cost of buying wind power from Wasatch. Through this set of possibilities, the Alliance suggests that decertification might allow ratepayers to obtain 70% of the savings if Rocky Mountain Power were relieved of the obligation to buy Wasatch's wind power.

This argument involves a basic fallacy: It assumes that the cost of wind power will exceed the price of conventional energy sources over the life of the contracts. But there is nothing in the record to compare the long-term costs of wind power and energy from conventional sources.

The Alliance submitted its own literature, which stated that as of an unspecified date, "the cost to utilities of obtaining power from conventional sources [was] below that of wind . . ., due principally to declining prices for natural gas." Pet'r's Reply Br., Ex. D at 2. This literature arguably constitutes

19

inadmissible hearsay. *See* Fed. R. Evid. 801(c). But even if we were to consider the Alliance's literature, the Wasatch contract was to last twenty years;[6] and the record lacks any evidence suggesting that wind power is likely to cost more than traditional energy sources over a twenty-year period. The Alliance's argument on redressability involves an unproven assumption about future costs of wind power that we cannot lightly assume.

Without this unproven assumption, we have no reason to expect any tangible benefit to ratepayers if the Wasatch projects were decertified.

### 4.     Conclusion

We conclude that the Alliance has failed to satisfy its burden on redressability. The electricity rates are already set, and the Alliance's argument on redressability assumes future rates and actions by third parties that we cannot predict with any reasonable measure of comfort.

### D.     Suggestion to Postpone Review

The Alliance suggests that Wasatch may not be able to complete the wind projects and points out that both contracts have ended. With termination of the contracts, the Alliance invites us to consider whether to dismiss this matter "without prejudice" on grounds that the "record and the Court would 'benefit from postponing review.' " Pet'r's Supp. Resp. Br. at 12 (quoting *Qwest Commc'ns Int'l, Inc. v. FCC*, 240 F.3d 886, 895 (10th Cir. 2001)).

---

[6]     Pet'r's Supp. Resp. Br., Ex. H at 2-3.

20

We have no reason to postpone review.  Standing is gauged at the time the petition is filed, and the Alliance has had ample time and opportunity to address traceability and redressability as of the time that it began the action.  Thus, we decline to postpone our review.

## III.   Conclusion

We hold that the Alliance lacks standing because it has not shown:  (1) that the alleged increase in electricity rates is traceable to an alleged error in FERC's decision, or (2) that the alleged injury would likely be redressed by a favorable decision.  Accordingly, the petition is dismissed.