FILED
**United States Court of Appeals**
**Tenth Circuit**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

**February 23, 2022**

**Christopher M. Wolpert**
**Clerk of Court**

_____

PRODUCERS OF RENEWABLES
UNITED FOR INTEGRITY TRUTH AND
TRANSPARENCY,

     Petitioner,

v.

ENVIRONMENTAL PROTECTION
AGENCY,

     Respondent.

------------------------------

HOLLYFRONTIER CHEYENNE
REFINING, LLC; HOLLYFRONTIER
REFINING & MARKETING, LLC;
SINCLAIR CASPER REFINING
COMPANY; SINCLAIR WYOMING
REFINING COMPANY,

     Intervenors.

No. 19-9532
(EPA No. 8486)
(Environmental Protection Agency)

_____

**ORDER**[*]

_____

Before **HARTZ**, **BALDOCK**, and **EID**, Circuit Judges.

_____

---

[*] This order is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel.  It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

Petitioner Producers of Renewables United for Integrity Truth and Transparency ("Producers of Renewables") seeks to challenge Environmental Protection Agency ("EPA") actions granting certain small refineries in Wyoming replacement fuel credits, known as Replacement Identification Numbers ("RINs"). These 2017 and 2018 agency decisions, on remand from judgment in this court, determined these refineries were entitled to exemptions from compliance with the Renewable Fuel Standard Program (the "Program" or "RFS") in 2014 and 2015 based on a finding of "disproportionate economic hardship." 42 U.S.C. § 7545(o)(9)(B). However, the lengthy judicial and regulatory proceedings caused the traditional relief—refunding the RINs each company had already retired for compliance—to be worthless as these credits had already expired. In order to provide a meaningful remedy, the EPA issued the refineries replacement RINs. Producers of Renewables seeks to challenge this relief. But because the group lacks constitutional standing, we dismiss for want of jurisdiction.

## I. BACKGROUND

### A. Statutory and Regulatory Background

#### 1. The Renewable Fuel Standard Program

In 2005, Congress passed and President George W. Bush signed the Energy Policy Act, Pub. L. No. 109-58, 119 Stat. 594 (2005). Among other things, this Act established the Clean Air Act's Renewable Fuel Standard Program. *Id.* § 1501, 119 Stat. at 106776 (codified as amended at 42 U.S.C. § 7545(o)). In 2007, Congress amended the Renewable Fuel Standard Program as part of the Energy Independence and Security Act. *See* Pub. L. No. 110-140, §§ 201–202, 121 Stat. 1492 (2007) (codified at 42 U.S.C.

2

§ 7545(o)).  As amended, the RFS requires the EPA to promulgate annual "renewable fuel obligation[s]" specifying volumes of renewable fuels to be introduced into the country's supply of transportation fuel each year.  *See* 42 U.S.C. § 7545(o)(2)(B), (3)(B).

The RFS statute contemplates that certain participants in the transportation fuel market—namely, "refineries," "blenders," and "importers"—will be required to satisfy annual "renewable fuel obligation[s]."  *Id.* § 7545(o)(3)(B)(ii).  To accomplish these goals, the Program regulates suppliers through "applicable volume[s]"—mandatory and annually increasing quantities of renewable fuels that must be "introduced into commerce in the United States" each year.  *Id.* § 7545(o)(2)(A)(i).  This volume is converted into "percentage standards" that apply to obligated parties, who must then ensure that for every gallon of nonrenewable fuel it produces or imports, adequate quantities of renewable fuels are introduced into the economy.  *Id.* § 7545(o)(2)–(3); 40 C.F.R. § 80.1406–80.1407.

## 2.  Renewable Identification Numbers

After the obligated parties have been identified and their percentage standards have been set, there remains the matter of compliance.  For every gallon of renewable fuel entering the U.S. market, producers and importers may generate a set of "Renewable Identification Numbers."  40 C.F.R. §§ 80.1426, 80.1429(b).  The number of RINs assigned to each batch corresponds to the amount of ethanol-equivalent energy per gallon in that batch.  *See id.* § 80.1415.  RINs remain attached to the renewable fuel until that fuel is purchased by an obligated party or blended into fossil fuels to be used for transportation fuel.  At that point, the RINs become "separated," meaning they are, in

effect, a form of compliance credit. A RIN may be used to demonstrate compliance during the calendar year it was generated, or the following calendar year, and thereafter is considered expired and cannot be used for compliance purposes. *Id.* §§ 80.1427(a)(6), 80.1428(c), 80.1431(a).

Each year, obligated parties must generate or purchase enough RINs to meet their renewable fuel obligations—which they then satisfy by "retir[ing]" RINs in an annual compliance demonstration to the EPA. *Id.* § 80.1427(a). This system gives obligated parties flexibility in demonstrating compliance by allowing them to generate RINs in several manners: producing renewable fuel on their own for use in the United States, purchasing and blending renewable fuels themselves, or purchasing RINs reflecting renewable fuel volumes blended by other entities. 72 Fed. Reg. at 23,900, 23,942 (May 1, 2007).

Obligated parties who have more RINs than they need may sell or trade their excess or they may "bank" those RINs for use to meet up to twenty percent of their obligations for the following compliance year. *See* 42 U.S.C. § 7545(o)(5)(B); 40 C.F.R. §§ 80.1425–29; 80 Fed. Reg. at 77,485 (Dec. 14, 2015). This system is predicated on the premise of empowering the renewable fuel market to operate "according to natural market forces," allowing obligated parties a means to comply with the standards in the most economically efficient way by avoiding, if they wish, expenditures on infrastructure or changes in blending practices. *See* 72 Fed. Reg. at 23,904, 23,908, 23,930, 23,933 (May 1, 2007).

### 3. The Temporary Exemption for Small Refineries

Congress was aware the RFS Program might disproportionately impact small refineries because of the inherent scale advantages of large refineries and therefore temporarily exempted small refineries from RFS compliance until 2011.[1]  42 U.S.C. § 7545(o)(9)(A)(i).  After a congressionally directed study by the Department of Energy ("DOE") determined that a number of small refineries would suffer "disproportionate economic hardship" if they were required to comply with RFS, Congress extended the blanket exemption for two more years.  *See id.* § 7545(o)(9)(A)(ii).  Thereafter, Congress provided a process for small refineries to petition the EPA "at any time" for an extension of the initial exemption "for the reason of disproportionate economic hardship."  *Id.* § 7545(o)(9)(B)(i).

## B. Factual Background

### 1. Initial EPA Proceedings

Sinclair Casper Refining Company, Sinclair Wyoming Refining Company (collectively "Sinclair"), and HollyFrontier Cheyenne Refining, LLC ("HollyFrontier") are small refineries under 42 U.S.C. § 7545(o)(1)(K).  Faced with various adverse economic conditions, each of these small refineries sought hardship exemptions.  The EPA initially denied these refineries hardship exemptions under the RFS for the 2014 and 2015 compliance years.

---

[1] Small refineries—those with an average annual output of 75,000 barrels per day of crude oil or less—may face greater difficulty complying with the Program than other obligated parties.  *See* 42 U.S.C. § 7545(o)(1)(K).

## 2. *Sinclair* and the EPA Decision on Remand

HollyFrontier and Sinclair then petitioned this court for review of the EPA's denials of their respective petitions. In *Sinclair Wyo. Ref. Co. v. EPA*, we held that the EPA—in the context of denying Sinclair's petitions—interpreted "disproportionate economic hardship" too stringently by requiring refineries to demonstrate an existential threat to their viability. 887 F.3d 986, 999 (10th Cir. 2017). As a result, we granted Sinclair's petition for review, vacated the EPA's 2014 decisions for Sinclair's two Wyoming refineries, and remanded for further proceedings. Because the EPA denied Sinclair's and HollyFrontier's 2015 petitions for a small refinery exemption on the same basis, we also granted EPA's voluntary request for remand and vacatur of those petitions.

On remand from this court, the EPA concluded that Sinclair and HollyFrontier were now entitled to small refinery exemptions. The EPA then turned to the appropriate remedy. During this lengthy administrative and judicial process, the facilities accumulated sufficient RINs to meet their respective 2014 and/or 2015 obligations. But by the time of this second agency decision, the RINs expired and were now "worthless." App'x Vol. III at 908. The EPA explained it used its "discretion to find another way to give meaningful value to those RINs." *Id.* It chose to "replicat[e] as closely as possible the situation that would have existed" had the exemptions been issued before *Sinclair*. *Id.* Therefore, the EPA decided to "un-retire" the RINs these refineries used for their 2014 and 2015 compliance and return them to each refinery. *Id.* It did so by exchanging each refinery's expired RINs on a one-for-one basis with trackable 2018 RINs. The

6

EPA's remedy allowed each small refinery to replace expired RINs previously used for RFS compliance with the same number of unexpired RINs.

### 3. D.C. Circuit Proceeding

Producers of Renewables is a group consisting of companies that own and operate facilities that produce biomass-based diesel or ethanol and participate in the Program. Pet'r Br. at 17.  As relevant here, it petitioned the D.C. Circuit to review these individual exemption remedies, arguing that the EPA improperly took this action without notice and comment and that it was not authorized to implement this remedy on remand from *Sinclair*.

The D.C. Circuit ruled that review of the EPA's decisions was locally applicable—as each one affected a small refinery in Wyoming.  *Producers of Renewables United for Integrity Truth and Transparency v. EPA*, 778 F. App'x 1 (D.C. Cir. 2019) (unpublished).  Because venue in the D.C. Circuit was only appropriate if the final action taken by the EPA was "nationally applicable," or if the EPA published a finding that an otherwise local action is "based on a determination of nationwide scope or effect," 42 U.S.C. § 7607(b)(1), the D.C. Circuit transferred that portion of the proceeding to our court.

## II.  ANALYSIS

On appeal, Producers of Renewables renews its challenge to: (1) the EPA's process in formulating these specific individual exemption remedies and (2) its authority to issue replacement RINs.  Before proceeding to the merits of Producers of Renewables' challenge, we must find that this case satisfies the jurisdictional requirements of

7

Article III of the Constitution. The Constitution limits the "judicial Power of the United States" to "Cases" or "Controversies," U.S. Const. art. III, §§ 1–2, and the requirements of standing are "rooted in the traditional understanding of a case or controversy," *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). "To state a case or controversy under Article III, a plaintiff must establish standing." *Ariz. Christian Sch. Tuition Org. v. Winn*, 563 U.S. 125, 133 (2011) (citation omitted).

We recognize that Intervenors have not challenged the standing of Producers of Renewables to raise their claims. Nevertheless, we have an independent obligation to verify that Producers of Renewables has Article III standing to bring its claims before proceeding further. *See New England Health Care Emps. Pension Fund v. Woodruff*, 512 F.3d 1283, 1288 (10th Cir. 2008) ("It is well established that any party, including the court *sua sponte*, can raise the issue of standing for the first time at any stage of the litigation, including on appeal."); *see also Valenzuela v. Silversmith*, 699 F.3d 1199, 1204–05 (10th Cir. 2012) (explaining that federal courts cannot "assume they have subject matter jurisdiction for the purpose of deciding claims on the merits"). Whether a plaintiff has Article III standing is a question we review de novo. *S. Utah Wilderness All. v. Palma*, 707 F.3d 1143, 1152 (10th Cir. 2013) (citation omitted).

When, as here, an organization or association sues on behalf of its members,[2] the organization has standing if:

---

[2] Producers of Renewables includes biomass-based diesel producers that participate in the RFS Program. These companies generate and/or hold RINs. To the best of our understanding, there is only one specific member company ("Member")

8

(a) [I]ts members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.

*Dine Citizens Against Ruining Our Environment v. Bernhardt*, 923 F.3d 831, 840 (10th Cir. 2019) (quoting *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)).

The EPA and the Intervenors do not argue, nor do we have any reason to believe, that Producers of Renewables fails to satisfy the latter two requirements. The issue before us, then, is whether at least one member of Producers of Renewables has standing under Article III. In order to show its members would otherwise "have standing to sue in their own right," *id.*, an organization must demonstrate that: (1) at least one of its members "has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000) (citation omitted). "We refer to these three familiar requirements as injury in fact, causation, and

_____

identified in this association. Other than this one company, Producers of Renewables has failed to identify a comprehensive list of its members. Ordinarily, a prerequisite for organizations alleging associational standing is to identify their affected members. *See Summers v. Earth Island Inst.*, 555 U.S. 488, 497–99 (2009). But that omission is not fatal here, because Producers of Renewables purports to represent only biomass-based diesel producers and apparently represents no other interests. When "*all* the members of the organization are affected by the challenged activity," there is no need to identify injured members. *Id.* at 499 (citation omitted).

redressability." *Habecker v. Town of Estes Park*, 518 F.3d 1217, 1224 (10th Cir. 2008) (citation omitted).

"The party invoking federal jurisdiction bears the burden of establishing" standing. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). The elements of standing "must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Id.* When, as here, we entertain a direct appeal from an administrative decision, the petitioner "must produce evidence on each element of standing as if it were moving for summary judgment in district court." *N. Laramie Range Alliance v. FERC*, 733 F.3d 1030, 1034 (10th Cir. 2013). If the opposing party contests these facts, the petitioner will "not enjoy the benefit of any inference" and must meet its burden of persuasion under a preponderance-of-the-evidence standard. *Id.* (internal quotation marks and citation omitted). This standard requires the movant "to support its position with the greater weight of the evidence." *Nutraceutical Corp. v. Von Eschenbach*, 459 F.3d 1033, 1040 (10th Cir. 2006) (citation omitted).

Finally, we note the Supreme Court has counseled that "when the plaintiff is not himself the object of the government action or inaction he challenges, standing is not precluded, but it is ordinarily 'substantially more difficult' to establish." *Lujan*, 504 U.S. at 562 (citations omitted). Setting aside the first requirement of standing, we find that Producers of Renewables has not made the requisite demonstration of either the causation or redressability element of standing.

10

## A. Causation

To properly establish causation, the injury "must be 'fairly traceable' to the challenged action." *Allen v. Wright*, 468 U.S. 737, 751 (1984) (citation omitted), *abrogated in part on other grounds by Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014). That is, the plaintiff must show there is a "substantial likelihood," *Nova Health Sys. v. Gandy*, 416 F.3d 1149, 1156 (10th Cir. 2005), that the injury is "fairly traceable to the challenged action of the defendant and not the result of the independent action of some third party." *Habecker*, 518 F.3d at 1224.

Producers of Renewables argues the challenged agency actions "have reduced the need to purchase physical gallons of biofuel to meet the RFS" and "reduced RIN prices." Pet'r Br. at 18. Consequently, it broadly contends its members "have lost sales, lost value for their product under previously entered contracts, lost customers, and, in some cases, have had to strand investments, as a result of EPA's actions and lost demand." *Id.*

The organization also relies on a sealed declaration from the Director of Sales and Marketing for a member of Producers of Renewables ("Member"),[3] to bolster its argument for standing. Member explains that "a series of press reports revealed the apparent expansion of the small refinery exemptions under the Renewable Fuel Standard program by EPA" to include "exemptions to refineries owned and operated by HollyFrontier Corporation and Sinclair Oil Corporation." Supp. App'x at 4-5. And Member attributes a "drop in RIN prices" and "volatility of the RIN market" in part to

---

[3] At the request of Producers of Renewables, we keep the association's membership list confidential, and refer to the relevant company only as Member throughout this order.

news of the "EPA's actions related to the small refinery exemption[s] . . . com[ing] to light." *Id.* at 7.

As Member tells it, "[g]ranting small refinery exemptions after EPA sets the standards for the coming year is perceived as allowing RINs to reenter the market." *Id.* at 8. This awareness, in turn, "[t]ypically. . . results in a decrease in [RIN] prices," *id.*, because approving small refinery exemptions in this manner reduces the required renewable volume obligations "and, thereby, reduces demand under the Renewable Fuel Standard program." *Id.* at 10. To support these claims, Member notes that "EPA has indicated that it granted 19 small refinery exemptions for compliance year 2016 and 29 small refinery exemptions for compliance year 2017." *Id.* at 11. And these "small refinery exemptions have reduced the volume requirements for 2016 by 790 million gallons and for 2017 by 1.46 billion gallons." *Id.* at 10. To demonstrate its concrete injury, Member described how "[p]rior to April 2018, D4 RINs were around $0.75. On October 18, 2018, D4 RIN values [were] reported at $0.31."[4] *Id.* at 9. Finally, seeking to tie the EPA's actions challenged in this appeal to its alleged injury, Member offers one news article. *See id.* at 9 n.10. This article purports to demonstrate that the EPA's decisions concerning Sinclair and HollyFrontier have "lowered RIN prices and created volatility in the RIN market." *Id.* at 09.

Producers of Renewables also provides a declaration from Collin Cain, an expert in the energy industry, to bolster its claim for standing. His report largely echoes many

---

[4] One gallon of biodiesel that qualifies as biomass-based diesel under the Renewable Fuel Standard program generates 1.5 D4 RINs. *See* Supp. App'x at 9.

of the concerns raised by Member.  He argues that "the sharp increase in [small refinery] exemptions provided by EPA has caused significant decreases in the renewable fuel volume obligations that EPA had set in advance of each compliance year."  Pet'r Br. Addendum, Cain Decl. ¶ 16.  This results in a drop in RIN prices—"reflecting both the reduction in obligation volumes, and also the uncertainty caused by EPA's complete lack of transparency [in granting these exemptions]."  *Id.* ¶ 26.  As evidence of this causal relationship, Cain includes reference to a series of articles which he claims depict how news of small refinery exemptions impacts RIN prices.  *See id.* ¶¶ 27–28.

We hold that Producers of Renewables has failed to show the required causal connection between its alleged injury and the challenged actions of the EPA.  Because the organization must produce evidence on each element of standing "as if it were moving for summary judgment in district court," *N. Laramie*, 733 F.3d at 1034, Producers of Renewables cannot establish causation "with conclusory allegations of an affidavit," *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990).

Producers of Renewables asserts the EPA's granting of nationwide small refinery exemptions has caused volatility in the market and devalued RINs.  *See, e.g.*, Supp. App'x at 7.  Perhaps so, but it is an altogether separate notion to establish that there is a "substantial likelihood," *Nova Health Sys.*, 416 F.3d at 1156, that its injury is fairly traceable to the EPA's individualized decisions to offer replacement RINs for three small refineries in Wyoming.  Here, we find that Producers of Renewables has not adequately explained how falling RIN prices or market volatility was caused by the EPA's decision to unretire RINs for HollyFrontier and Sinclair.

In Member's declaration, for example, we find one attempt to directly tie the challenged actions in this appeal to its alleged injury.  Member cites to a June 1, 2018, article from the Environmental and Energy Study Institute ("EESI") to support its argument that "[r]eports of EPA . . . allowing HollyFrontier and Sinclair to generate 2018 RINs as a result of reversing previously denied exemption requests. . . lowered RIN prices and created volatility in the RIN market."  Supp. App'x at 8–9.  But the article does not focus on the EPA's decisions that are contested in this appeal.  While it briefly references HollyFrontier and Sinclair, the article goes on to state that "[u]nder a previously little-used authority, EPA had already taken steps to grant small refinery exemptions to approximately two dozen petroleum refiners, relinquishing them of their duty to either blend biofuels or buy compliance credits under the Renewable Fuel Standard."  *Id.* at 9 n.10.  From there, the EESI argues, "[t]he net effect of the waivers and continued uncertainty has been a tumble in RIN prices."  *Id.*  The EESI's core concern is the fact that "the Trump Administration has been awarding [hardship waivers] to refiners of all sizes, including refining giants."  *Id.*

Further, this article, which reported on the breaking news of the EPA's decision to issue replacement RINs for HollyFrontier and Sinclair, was published on June 1, 2018.  According to Member, news of this decision negatively affected it—by causing RIN prices to drop and introducing volatility into the RIN market.  *See, e.g.*, Supp. App'x at 7.

14

But RIN prices were steadily falling prior to this announcement.[5]  Dating back as early as January 2018, RIN prices were in decline.  In fact, the price of the D4 RIN, specifically highlighted by Member as evidence of its alleged injury, *id.* at 9, actually increased after news of the EPA's challenged decision in this appeal went public.  On May 28, 2018, the price of a D4 RIN was $0.56.  By June 4, 2018, the price of a D4 RIN was $0.85.

Cain fares no better in his attempt to link the EPA's decision to issue replacement RINs for three small refineries in Wyoming to the alleged injuries suffered by Producers of Renewables' members.  Throughout his declaration, he repeatedly criticizes the EPA's overarching decision to increase the number of small refinery exemptions it grants each year.  *See* Pet'r Br. Addendum, Cain Decl. ¶ 23 ("EPA's abrupt expansion of small refinery exemptions, granted after the renewable fuel volumes had been set, and in some, if not all, cases after the compliance period had ended, has reduced the renewable fuel obligations that biofuel producers had relied upon to plan and invest."); *see also* ¶¶ 16, 26, 31–34.

His inclusion of Figure 3, *id.* ¶ 30, cuts against a claim for standing.  It visually portrays falling RIN prices imposed over various events related to news of small refinery

---

[5] *See RIN Trades and Price Information*, UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, https://www.epa.gov/fuels-registration-reporting-and-compliance-help/rin-trades-and-price-information (last updated Jan. 10, 2021).  "It is not uncommon for courts to take judicial notice of factual information found on the world wide web." *O'Toole v. Northrop Grumman Corp.*, 499 F.3d 1218, 1225 (10th Cir. 2007); *see also, e.g., Schaffer v. Clinton*, 240 F.3d 878, 885 n.8 (10th Cir. 2001) (taking judicial notice of information found on an online political almanac); *see also City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 655 n.1 (6th Cir. 2005) (taking judicial notice of a term defined on the website of the National Association of Securities Dealers, Inc.).

exemptions. Yet four out of the five depicted events deal with the EPA's decision to increasingly grant nationwide small refinery exemptions—not the agency's decision to unretire RINs. The first article, from January 25, 2018, "reported that EPA was reviewing 27 applications from small refineries to waive their RFS obligations." *Id.* ¶ 27. And the April 2018 article was an "exclusive" report from Reuters that the EPA granted small refinery exemptions "to three small refineries owned by Andeavor, one of the largest U.S. refining companies." *Id.* ¶ 28. Neither article concerned the issue at stake in this appeal. Indeed, Cain writes: "[t]he sustained fall in RIN prices and increased price volatility, caused by the progressive revelations of EPA's actions on small refinery exemptions, and particularly the fact that EPA has been granting exemptions retroactively, represent substantial disruptions to the biofuel industry." *Id.* ¶ 31.

The common thread between the declarations of Member and Cain is a fixation on the EPA's "sharp increase in granted [small refinery] exemptions" across the country. *Id.* ¶ 24. In so doing, we agree with the refineries that Producers of Renewables "fails to identify any basis for attributing market-wide fluctuations in RIN prices to the limited number of replacement RINs EPA issued to Sinclair and HollyFrontier." Intervenor Br. at 14. Producers of Renewables does not delineate between the EPA's decision to grant an increasing number of small refinery exemptions over the past several years—an issue not challenged in this appeal[6]—from the agency's decision to issue replacement RINs to HollyFrontier and Sinclair. The failure to do so proves fatal to its ability to demonstrate

---

[6] "Petitioner has not challenged the exemptions themselves." Respondent Br. at 9.

there is a "substantial likelihood," *Nova Health Sys.*, 416 F.3d at 1156, that its injuries are fairly traceable to the EPA's individualized decisions to unretire RINs for three small refineries in Wyoming.

What is more, Producers of Renewables fails to contend with other potential causes of its alleged injuries. As the refineries point out, "[s]upply and demand for transportation fuels, renewable fuel, and RINs can be influenced by a host of factors, such as trade policies, consumer demand, and overall renewable fuel production." Intervenor Br. at 16 (citation omitted); *see also* App'x Vol. II at 772 (discussing economic fundamentals such as "weather, driving demand, oil prices, [and] geopolitical factors" as influencers of RIN pricing). Indeed, its own brief betrays its position. *See* Pet'r Br. at 15 n.22 ("RIN prices were 'relatively calm' in 2015 and 2016, but, 'with the administrative change,' there was 'policy uncertainty-driven price behavior.'" (citation omitted)).

"Although the traceability of a plaintiff's harm to the defendant's actions need not rise to the level of proximate causation, Article III does require proof of a substantial likelihood that the defendant's conduct caused plaintiff's injury in fact." *Habecker*, 518 F.3d at 1225 (internal quotation marks and citation omitted). If "speculative inferences are necessary" to connect the alleged injury "to the challenged action, this burden has not been met." *Id.* (internal quotation marks and citations omitted). And even though "harm to a third party" resulting from a government policy imposed on a separate entity does not necessarily defeat standing, "it may make it substantially more difficult . . . to

establish that, in fact, the asserted injury was the consequence of the defendants' actions." *Warth v. Seldin*, 422 U.S. 490, 505 (1975).

The final element in our consideration is not that agency action merely negatively impacted a prospective litigant, but that the harm suffered by the party was a direct result of an "agency's alleged failure to follow the [law]." *Comm. to Save the Rio Hondo v. Lucero*, 102 F.3d 445, 451–452 (10th Cir. 1996). Consistent with our logic in *Committee to Save the Rio Hondo*, our sister circuit has held that "[t]he issue in the causation inquiry is whether the alleged injury can be traced to the defendant's challenged conduct, rather than to that of some other actor not before the court." *Ecological Rights Found. v. Pacific Lumber*, 230 F.3d 1141, 1151 (9th Cir. 2000) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992)). Here, we do have an allegation of agency lawbreaking, but there is no nexus between the law breaking and the harm incurred. The harm, as argued by Producers of Renewables, was the volatility and unpredictability of the markets. This volatility, such as it was, was not the result of the unlawful conduct that Plaintiff alleges, but rather the result of permissible conduct. Conversely, the law breaking alleged, the replacement RINs, were not persuasively shown to have harmed the Plaintiff.

Given Plaintiff's inability to meet the burden prescribed by *Committee to Save the Rio Hondo* and the burden of persuasion in *Warth*, we find the asserted injury cannot be said to be fairly traceable to the challenged agency action.

18

### B. Redressability

"To demonstrate redressability, a party must show that a favorable court judgment is likely to relieve the party's injury." *WildEarth Guardians v. Pub. Serv. Co. of Colo.*, 690 F.3d 1174, 1182 (10th Cir. 2012) (internal quotation marks and citation omitted). Although causation and redressability are closely related, *Nova Health Sys.*, 416 F.3d at 1159, the twin requirements remain distinct and must be separately met, *N. Laramie*, 733 F.3d at 1034–39. "A showing that the relief requested *might* redress the plaintiff's injuries is generally insufficient to satisfy the redressability requirement." *WildEarth Guardians*, 690 F.3d at 1182 (citation omitted).

We hold Producers of Renewables has failed to show that a judgment against the EPA in this action would likely redress its alleged injuries. The record does not support a finding that a judgment instructing the EPA to claw back the replacement RINs issued to HollyFrontier and Sinclair would relieve its injuries. As noted above, Producers of Renewables repeatedly asserts that the EPA's decision to increasingly grant small refinery exemptions across the nation caused volatility in the market and a subsequent drop in RIN prices. For that reason, we do not see how a decision reversing the EPA's chosen remedy for three small refineries recoups lost demand for its biofuel or halts falling RIN prices.

Most significantly, a judgment in Producers of Renewables' favor would do nothing to stem the volume of small refinery exemptions granted by the EPA. In reaching this conclusion, we emphasize that Producers of Renewables "does not challenge the validity of the exemptions themselves." Respondent Supp. Br. at 1. It only

contests the appropriate remedy for these three small refineries in this unique context.[7]

Accordingly, Producers of Renewables has not established that its requested relief "is likely to relieve the party's injury." *WildEarth Guardians*, 690 F.3d at 1182 (citation omitted).

We also observe that it is uncertain what remedy the EPA would fashion on a potential remand. "Courts have been loath to find standing when redress depends largely on policy decisions yet to be made by government officials." *US Ecology, Inc. v. U.S. Dept. of Interior*, 231 F.3d 20, 24 (D.C. Cir. 2000). That is because redressability in this case "depends on the unfettered choices made by [government] actors . . . whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict." *ASARCO Inc. v. Kadish*, 490 U.S. 605, 615 (1989).

Further, even if the EPA were to "offset the refinery's future obligations," Pet'r Br. at 30 n.31, as Producers of Renewables suggests, this would reduce the renewable fuel volume obligations for an upcoming year. In turn, there would likely be an increase in the available RINs for that upcoming year, thereby minimizing "the need for production of biodiesel gallons and reducing the price for current production." Supp. App'x at 11. Consequently, this proposed remedy would likely have little to no impact on rectifying the alleged injuries. And as the refineries note, this recommendation is not practical. "It overlooks the very real possibility that, in the next compliance year, the

---

[7] EPA's counsel stated at oral argument this is "the only time [the replacement of RINs after they have expired] has ever happened. . . . It's not happened before or since,. . . only in these five cases." Oral Arg. at 29:26–29:39, No. 18-1202 (D.C. Cir. May 7, 2019).

refinery would merit an exemption from future obligations. Offsetting future obligations in lieu of making the refineries whole would only serve to deny them a remedy in a different year." Intervenor Supp. Br. at 12 n.4.

At bottom, the Supreme Court has stated that "[p]etitioners must allege facts from which it reasonably could be inferred that . . . if the court affords the relief requested, the [injury] will be removed." *Warth*, 422 U.S. at 504. But Producers of Renewables offers no reason to believe that a decision requiring the EPA to reclaim the replacement RINs issued to HollyFrontier and Sinclair would "be substantially likely to redress," *Nova Health Sys.*, 416 F.3d at 1160, its alleged injuries. Instead, it is likely that any potential remedy would result in a dilution in the value of the RINs that Producers of Renewables' members generate.

## C. Procedural Standing

We next turn to the fact that Producers of Renewables alleges, at least in part, a procedural injury due to the EPA's failure to hold notice and comment rulemaking. An alleged procedural injury is subject to a "somewhat relaxed, or at least conceptually expanded," standard of standing. *See WildEarth Guardians v. EPA,* 759 F.3d 1196, 1205 (10th Cir. 2014). For example, a plaintiff need only show that its alleged injury "could be redressed by requiring the agency to make a more informed decision." *Id.* Here, however, these more relaxed standards of standing do not help Producers of Renewables. That is because, as set forth above, Producers of Renewables cannot show that the EPA could do anything to redress their alleged injury, under any set of circumstances. In this case, we need not consider whether Producers of Renewables' alleged injury could be

21

redressed by notice and comment rulemaking, as it cannot be. We accordingly conclude that, to the extent that Producers of Renewables relies on procedural standing to establish standing, the attempt fails.

**D. Supplemental Briefing**

After oral argument, Producers of Renewables filed a notice of supplemental authority under Fed. R. App. P. 28(j) to highlight our court's decision in *Renewable Fuels Association v. EPA*, 948 F.3d 1206 (10th Cir. 2020). Of note, Producers of Renewables contends that in *Renewable Fuels* we rejected arguments similar to ones raised by the refineries in this case, which contested the petitioners' standing to sue.

For two reasons, we find that *Renewable Fuels* has no bearing on our obligation to ensure that Producers of Renewables "had Article III standing at the outset of [this] litigation." *Friends of the Earth*, 528 U.S. at 180. First, the petitioners in *Renewable Fuels*—four organizations that make up the Biofuels Coalition—challenged an agency decision distinct from what is at stake in this appeal. There, the petitioners argued the EPA exceeded its statutory authority in granting *extensions* of several small refinery exemptions.

We are confronted with a different issue. Unlike the petitioners in *Renewable Fuels*, Producers of Renewables does not challenge the validity of the EPA's decision to grant HollyFrontier and Sinclair hardship exemptions. But in *Renewable Fuels*, the Biofuels Coalition argued the EPA improperly conducted its "disproportionate economic hardship" evaluation for certain small refineries. 948 F.3d at 1252. In so doing, the Biofuels Coalition claimed the EPA should never have granted these hardship

22

exemptions in the first place. That is not contested in this case. In order to effectuate the hardship exemptions to ensure it provided relief to HollyFrontier and Sinclair, the EPA granted the small refineries replacement compliance credits. As such, Producers of Renewables only challenges the decisions to grant replacement RINs—not the underlying small refinery exemptions.

These differences have implications for our standing analysis. For example, in *Renewable Fuels*, we vacated the EPA's grant of three small refinery extension petitions. But in this case, a remand would only reverse the chosen remedy—not the hardship exemptions. Therefore, the EPA would still need to fashion another solution so that the exemptions offer the refineries meaningful relief. It is this case-specific reason that influences our conclusion that a judgment against the EPA would not be substantially likely to redress Producers of Renewables' alleged injuries.

Second, the petitioners in *Renewable Fuels* met their burden of persuasion to prove their standing to bring suit. They detailed before our court their injury. And unlike Producers of Renewables, the Biofuels Coalition delineated how the challenged small refinery exemptions caused their injuries. Toward that end, one of the petitioners' economists "identifie[d], as a percentage [of total renewable fuel obligations for the refineries in question], what the [contested] extensions granted to the Refineries represent[ed] in terms of all exempted volumes." *Id.* at 1232. He also provided specific calculations for estimated revenue reductions for some of the petitioners' members "due to the Refineries' extensions." *Id.* at 1232–33. The economist even "attest[ed] that ethanol prices would have been $0.08 per gallon higher in February 2018 absent these

extensions." *Id.* at 1233.  In contrast, Producers of Renewables provides no more than a

broad, macro analysis of the RIN market.

### III.  CONCLUSION

Producers of Renewables lacks Article III standing.  Accordingly, we DISMISS the
petition for review.


Entered for the Court


Allison H. Eid
Circuit Judge

24